RCANNELLA, Judge.
Plaintiff, Patricia Sehexnayder, appeals from a judgement dismissing her suit for personal injuries sustained in a head-on automobile collision. Defendants are Calvin Perkins, the driver of the other vehicle, Lionel Perkins, the owner of the vehicle, the Louisiana Insurance Guaranty Association (LIGA) on behalf of insolvent Fidelity Fire & Casualty Co. (Fidelity), the insurer of the Perkins vehicle, and State Farm Mutual Automobile Insurance Co. (State Farm), the uninsured/underinsured (U/M) motorist carrier of plaintiff. We reverse and render a damage award.
On April 1, 1989, plaintiff was driving on Airline Highway in Metairie, Louisiana in an easterly direction when her vehicle was struck head-on by a car traveling in the opposite direction which crossed over the median. The collision occurred at the intersection of Severn Avenue and Airline Highway. The accident was caused when defendant, Calvin Perkins, had problems with his brakes and lost control of the car.
IsOn April 2, 1990, plaintiff filed suit in proper person and in forma pauperis claiming injuries to her head, neck and back and for bruises and lacerations. The petition was amended on September 8, 1992 to include a claim against LIGA, on behalf of defendants’ insolvent insurer and against State Farm for penalties and attorney fees for arbitrarily and capricious failure to pay her claim for medical expenses, general damages and loss of wages as provided in the U/M insurance contract.
On December 7, 1992, plaintiff filed a motion for partial summary judgment on the issue of penalties and attorney fees for arbitrary and capricious failure to pay her claim. The judge denied the motion on February 10, 1993.
The case was tried before a jury on June 24 and June 25, 1993. Following presentation of plaintiffs case, State Farm moved for a directed verdict on the issue of penalties and attorney fees, which was granted by the judge. After completion of the remainder of the trial, the jury returned a verdict in favor of defendants and dismissing plaintiffs case. The jury was provided one interrogatory stating that it found it favor of plaintiff, with a blank line for damages, if any, and another interrogatory stating that it found in favor of defendant. During deliberations, the jury twice requested the judge to inform it whether plaintiff had been compensated and once asked whether they had to assess damages for the accident as a whole or only for the claimed recurrence of a tumor. The judge *1067 responded that they had to decide the damages from the evidence and he could not tell them if plaintiff had been compensated for any portion of the damages.
After deliberations, the jury found in favor of defendants, State Farm and LIGA. There was no indication whether the verdict was based on failure to prove liability or damages. A judgment was rendered by the judge on July 1, 1993.
On appeal, plaintiff asserts that the trial judge erred in dismissing her motion for partial summary judgment on the issue of penalties and attorney fees, in denying her motion to compel responses to requests for admissions relative to |4the same issue and in failing to deem the matters therein admitted. Plaintiff further asserts that the judge erred in granting defendant, State Farm’s, motion for a directed verdict on the penalties and attorneys fees issue because he had previously ruled the matter was a jury issue. Last, plaintiff asserts that the judge erred in denying her motion for a new trial because the jury was confused when it rendered its verdict and because plaintiff proved both liability and damages.

DENIAL OF MOTION FOR NEW TRIAL-VERDICT

Plaintiff asserts that the jury was obviously confused as to what it was supposed to award her. She contends that this is shown by the questions asked by the jury during deliberations. Defendant asserts that the jury was not confused, but simply rendered a verdict against plaintiff on the evidence.
The jury was provided with two verdict forms. One simply said that the jury found in favor defendants, State Farm and LIGA. The other apparently (it is not in the record but the judge referred to it in his charges) simply stated that the jury found in favor of plaintiff and provided a line for damages, if any. The jury returned to the trial court the form which stated that it found in favor of defendants.
Twice during deliberations, the jury asked the judge if plaintiff had been paid any compensation for the accident. First the judge responded that the jury was not entitled to ask that question because they were not entitled to the response. He stated that they were only entitled to know what they heard in the courtroom, so he could not answer the question. The second time, the jury foreman informed the judge that the jury was “having very tough time understanding something. Can we ask this question: Was the plaintiff in any way compensated?” The judge responded that it was not before them. It was not a question they were to determine. He further said:
“You are to simply look at the accident, whether the fact of the accident, listen to the testimony you’ve heard and decide as a result of that accident what damages, if any, you can say flowed from that. Do not concern yourself |5with compensation, whether it is or not. I don’t know that so you are not to concern yourself with that question.”
The third question asked by the jury was “... then are we as jurors, responsible for determining damages for the accident as a whole or simply the damages for recurrence of a tumor?” The trial judge told the jury it had to award damages, if any, on the basis of the evidence and that he was precluded from giving them any further information.
We find that the jury was confused as to the damages and the two verdict forms did not help. However, we will review the evidence to determine whether the confusion tainted the verdict.
Plaintiff produced the testimony of an objective eyewitness to the accident, Brian Plaideau. On April 1, 1989, Plaideau was a passenger in a car which was stopped for a red light in the turning lane from Airline Highway onto Severn Avenue, the location of the accident. He stated that he heard the sound of brakes and turned his head toward the sound. He saw a vehicle coming toward him from the opposite direction, against the traffic flow. He saw the other vehicle crash into the car that plaintiff was driving, which was in the next lane. Plaideau testified that the impact was extremely hard and that he saw plaintiff’s head bouncing back and forth. Plaideau stated that he and the driver of the car he was in made a u-tum, returned to the scene and waited for the police. He testified *1068 that plaintiff was laying on the ground when he next observed her. Plaideau said that when an ambulance arrived, the medics had to pick her up.
Plaintiff was taken to the emergency room at East Jefferson General Hospital. Before the ambulance left the scene of the accident, the medics put on a neck brace and placed her on a spine board. At the hospital, x-rays were taken of her back and neck and a CAT scan was taken of her head. The emergency room report shows that she was suffering from abrasions on her knees and head and pain in her neck and back. No fractures or broken bones were found. SheJ^was given pain medication, muscle relaxants and sent home.
Plaintiff made an appointment with her internist, Dr. Gerald Weiner, on April 6, 1989. He testified that plaintiff provided him with a history of the accident. She told him that she was involved in a head-on collision on April 1st and that she was wearing her seatbelt. She told him about head trauma from possibly striking her head on the steering wheel. She told him that she did not lose consciousness, but both knees struck the dashboard. She related her ambulance and emergency room experience and told him that she was given Soma, a muscles relaxer, Myoflex and Ibuprofen, an anti-inflammatory drug.
Dr. Weiner examined plaintiff and discovered abrasions, bruises on her knees, tenderness of her shoulder area, her back and neck. She also had buttock pain. He studied the emergency room report and noted that she was treated there for aching neck, mid-back and low back, generalized soreness, head swelling and pins and needles in her left foot. Because of the head injury, there was concern about seizures. He prescribed Soma and Motrin, another anti-inflammatory and pain reliever. He then referred her to an orthopedic specialist, Dr. Robert Steiner.
Dr. Weiner noted that he saw plaintiff for the last time on June 12, 1989. He was aware that she had a history in 1983, of the removal of a benign meningioma[1] (brain tumor). He knew that she had recurrent benign meningioma tumors removed in 1990. In the June visit, he noted that her par-aesthesia (numbness, tingling), which had existed prior to the accident, had become worse and was affecting the hands and feet. He was not able to give an opinion as to whether the paresthesia was related to the accident because in 1986 she had an ulna nerve palsy problem or carpel tunnel syndrome in her wrist, which is a compression of the nerve. However, he did state that it is conceivable that the accident could have caused an exacerbation of the problem, but that he did not 17know this for a fact.
Dr. Weiner was questioned about plaintiff’s prior history. He stated that she had low back complaints in 1987 caused by a retro-verted uterus. She also suffered falls in 1987 and 1988, which affected her back and head with no residual effects.
Plaintiff described the accident essentially the same as Brian Plaideau. Plaintiff added that the day was bright and clear. She was almost at the intersection when she realized the other car was coming across toward her. She stated that she honked her horn and slammed on her brakes, but that the car hit her head-on. Plaintiff testified that she was thrown forward, striking her head on the steering wheel and slamming her knees against the dashboard. She got out of the car and asked if the other driver was alright. She said she received no answer and started to go find a telephone to call the police. At that time, she suffered a wave of dizziness and had to sit down. Her head and knees hurt, as well. Because of the dizziness, plaintiff returned to her car, sat in the passenger seat and waited. She stated that people came and went, she gave her parents’ phone number and eventually the ambulance arrived. The medics then placed her in a neck collar, made her lie down on a bed, strapped a board on her back and took her to the hospital. While she was at the hospital, she began to suffer radiating neck and back pain and general soreness. She was x-rayed, given a CAT scan and prescriptions. The next day she called Dr. Weiner and made an appointment for April 6, 1989. She was prescribed physical therapy by both Dr. Weiner *1069 and Dr. Steiner, which she received for two months at Health South Rehabilitation Center.
Plaintiff was questioned about her 1983 brain tumor. She stated that she was 27 years old at the time and that Dr. Joseph Nadell, a neurosurgeon, performed the surgery. Afterwards, she was followed by Dr. Arceneaux, a neurologist. She stated that the surgery was successful and she had no | gproblems until 1989. Plaintiff testified that the 1983 tumor had been growing for many years. The symptoms for that tumor were visual disturbances and headaches.
Plaintiff testified that she had seen Dr. Nadell in February 1989, before the accident. At that time, a MRI was performed and a suspicious enhancement in the site of the original tumor was seen. She went to Dr. Nadell again after the accident because she had received the blow to the head. In August 1989, another MRI was performed and in 1990, Dr. Charles Bent performed surgery removing two benign tumors at the site of the original tumor.
Plaintiff claimed that as a result of the accident, she lost her ear, did not work for the two weeks following the collision, then lost her job because of the time she was spending at physical therapy. She stated that she had started a cancer therapy group in February and was worried about the effect of the collision on her head. Even though her tumors were not cancerous, therapy was recommended because the mental anxiety caused by the suspicion of the new tumors was the same as in a cancer patient.
On cross-examination, she was questioned about the reason she was terminated from her job as a paralegal with a local law firm. She stated that she was told that if pressed, the firm would state she was terminated because she was not qualified for the work at hand. She admitted that some other people had been laid off and that someone told her that the firm was going through a cost cutting process.
Defendants questioned plaintiff about other claims, one from another automobile accident, filed in 1990, for which she was claiming disabling injuries, and one claim against an insurance company for a trip and fall accident. In the auto suit she alleged that her car had been struck broadside by another vehicle. She explained that an insurance claim was made for the trip and fall, when she fell while caring for someone who had knee surgery.
19Plaintiff admitted that she had taken birth control pills in the past. Later testimony linked estrogen and brain tumors. She agreed that she was under stress in February 1989 and knew that the MRI showed that the tumor may have recurred. On re-direct, plaintiff noted that it was not clear that the tumor was recurring until August 1989. She further noted that between May 1989 and January 1990, she worked only temporary short-term assignments.
At the close of this evidence, plaintiff offered into evidence the medical records of Dr. Steiner and the deposition of Dr. Bent, which was read to the jury. Dr. Bent testified that he performed the second surgery, that he was not aware of any scientific evidence to connect recurrence of a tumor, the cause of a tumor or the enhanced growth rate with trauma to the head, or any other particular causative factors which may cause the growth of a meningioma tumor. Plaintiff then rested.
Defendants called Dr. Carl Culieehia, a neurosurgeon, he examined plaintiff once on November 11,1992 and reviewed her medical records. He explained that meningioma is a benign slowly growing tumor of the central nervous system. He stated that a tumor can recur because tumor cells sometime remain behind, buried in the brain tissue where the cells cannot be found. He noted that tumors grow by cell division, and that removal of the tumor does not insure that all the cells have been removed. He stated that symptoms of the tumor include tingling, parthesia, headache and vision problems. Usually the larger the tumor, the longer time the tumor has been growing. Dr. Culieehia stated that he believed that plaintiffs tumors were a recurrence of the original tumor, because they were located at the same site. He testified that he was not aware of any literature or evidence that trauma can cause a tumor or accelerate the growth of a tumor.
*1070 Dr. Joseph Nadell, plaintiffs neurosurgeon in 1983 and 1989, testified by deposition. He stated that plaintiff did well after the first surgery in 1983. He did not see her again until 1989 when she complained of funny feelings in her head, hopressure and numbness in her head. A CAT scan and MRI were performed showing two areas of enhancement in the same location as the first tumor. Because the enhancement could have been scar tissue, he decided to watch the areas for six months to see if there were any changes. He noted that she returned in April following the accident. At that time, she was wearing a neck collar and reported that she suffered a flexion hyperextension injury and was being treated by Drs. Weiner and Steiner. He stated that his examination showed tenderness in the neck muscles and tingling or paraesthesia, which he related to the accident. Dr. Nadell stated that the paraesthesia was related to muscle spasm in the neck, giving her a mild thoracic outlet syndrome.
On cross-examination, Dr. Nadell stated that paraesthesia from muscle spasm resolves in a couple of months. He admitted that she had complaints of paraesthesia in 1984 or 1985, but stated it could not be a residual of that surgery because the surgery involved the frontal lobe and he did not think that would affect bilateral hand problems. He maintained his position that this par-aesthesia was related to the cervical injury. He did not believe that the trauma of the collision caused or accelerated the tumor growth. He stated there was some interest in the traumatic tumor concept at one time based on anecdotal histories. However, incidents of tumor connected with a past history of head injury involved skull fractures and it was thought that a tumor might be induced at a fracture line. Since plaintiff has no fractures at the tumor site, this theory cannot be attributed to the recurrence of her tumor. He also stated that he has not kept up with the literature on these types of tumors since he has specialized in pediatric neurosurgery since 1989. On cross-examination, Dr. Nadell stated that tumors of this type are usually slow growing, but not always. He said that usually the tumors grow faster in younger people. Dr. Nadell last treated plaintiff in August 1989, when her case was turned over to Dr. Bent.
When an appellate court reviews the factual findings of the trial court, it is 1 ulimited to a review for manifest error. Fisher v. River Oaks, 93-CA-677 (La.App. 5th Cir. 3/19/94); 635 So.2d 1209; Stobart v. State Through DOTD, 617 So.2d 880 (La.1993). The court may only modify or set aside a factual finding of the jury when it is clearly wrong. Fisher at 1215; Stobart at 882. This is resolved by determining whether the finding was reasonable in light of the record reviewed in its entirety. Fisher at 1215; Stobart at 882.

LIABILITY

The jury verdict and judgment only refer to State Farm and LIGA. No mention is made about Calvin and/or Lionel Perkins. After our review of the record and evidence, we find that liability was clearly proven against defendant, Calvin Perkins, the driver of the car that hit plaintiff head-on. Defendants stipulated that Calvin Perkins was driving the other vehicle and the testimony of both plaintiff and Brian Plaideau proved that the accident was the fault of defendant, Calvin Perkins. Further, there is no dispute that Fidelity and State Farm provided coverage. Thus, the jury was manifestly erroneous in rendering a verdict in favor of State Farm and LIGA instead of plaintiff, and the judgment must be reversed on the issue of liability as to Calvin Perkins, State Farm and LIGA.
Defendant, Lionel Perkins, the owner of the vehicle Calvin Perkins was driving, was also named a defendant in the suit. No evidence of Lionel Perkins’ liability was introduced at trial, consequently, he must be dismissed from the suit.

DAMAGES

Since the jury did not award any damages because they found in favor of defendants, we must decide de novo the amount of damages, if any, that plaintiff is entitled to recover.
In regard to whether the accident caused the second tumors or caused the ac *1071 celeration of the growth of the tumors, we find that there was no competent evidence produced to prove a connection between the accident and the tumors. Consequently, plaintiff failed in carrying her burden of proof on this item of |12damages.
In regard to lost wages, only plaintiff testified that she did not work for two weeks due to the injury. She argues on appeal that the deposition of Dr. Steiner, her orthopedic surgeon, supports this allegation. However, a close review of the record shows that Dr. Steiner was deposed by video tape for trial purposes, but his deposition was not received into evidence. Thus we cannot consider it. After our review of the testimony, we do not find that plaintiff proved her lost wages for the two weeks by a preponderance of the evidence. Further, we do not find that she proved, by a preponderance of the evidence, that she was terminated due to the accident. As a result, we find that no recovery for lost wages is due.
In regard to other damages, the medical records clearly support the testimony that plaintiff suffered a cervical and lumbar strain, received medications specifically for these injuries and went to physical therapy for from April 7, 1989 through June 2, 1989, on the average of every two days. The testimony also showed that plaintiff suffered soft tissue injuries to her neck and back. Plaintiff suffered abrasions, bruises and a soft tissue injury of two months duration. The medical expenses attributed to the emergency room, ambulance costs and follow up care for the neck, back and abrasions were stipulated in the amount of $3,328.01. We find that she is entitled to the stipulated damages in the amount of $3,328.01 and general damages in the amount of $2,500.00 for these injuries.

PENALTIES AND ATTORNEY FEES

A. Motion for Summary Judgment
Plaintiff filed a motion for summary judgment on the issue of penalties, attaching some medical documents and asserting that State Farm had been sent the medical report of the attending physician and the police report and that a claim had been made which it failed to pay. No affidavits or depositions were attached to prove these assertions. State Farm specifically denied that it had received satisfactory proof of loss in its answer.
| isLa.C.C.P. art. 966 provides that a motion for summary judgment may be granted if the “pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law.” In this ease, the trial judge declined to grant the motion because he believed there were genuine issues of material fact. After our review of the record, we agree. A motion for summary judgement is not a substitute for trial on the merits when there are factual matters in dispute. Plaintiffs motion and the pleadings do not overcome State Farm’s denial that it received satisfactory proof of loss requiring it to pay the claim. Thus, we find that the trial judge correctly denied the motion.
Plaintiff also asserts that because the trial judge found that this issue required a factual determination, he erred in granting the motion for directed verdict at the close of plaintiffs case in chief. She argues that the issue should have gone to the jury. We disagree. La.C.C.P. art. 1810 permits the trial judge to direct a verdict on a factual issue in a jury trial, if plaintiff did not bear its burden of proof on the issue. In this ease, plaintiff did not produce any evidence whatsoever during her case in chief on the issue of arbitrary and capricious failure to pay the claim. Thus, the trial judge did not err in granting the motion for directed verdict on the claim for penalties and attorney fees.
B. Request for Admissions
Plaintiff propounded requests for admissions. The requests were not filed into the record at the time they were sent, but were attached to a Motion to Compel the defendant to answer the admissions.
The requests ask for an admission that:
*1072 a. Plaintiff filed a claim with defendant under the liability provisions of the policy;
b. State Farm provided and had in full effect a liability and uninsured/underin-sured policy covering plaintiff for medical payments, loss of earnings and uninsured motorist coverage;
c. The primary carrier, Fidelity, was insolvent;
d. The claim was not paid for medical payments, loss of wages and uninsured motorist coverage.
Instate Farm failed to answer or otherwise respond to the requests. In response to the failure, plaintiff filed a motion to compel the admissions. State Farm filed an opposition claiming that the motion to compel should be denied because the request for admissions was directed to the wrong party, State Employees Group Benefits Program. The motion to compel was thereafter denied.
The Code of Civil Procedure does not require plaintiff to file a motion to compel admissions. However, the code provides that if “interrogatories, requests, answers, or responses” are to be used at trial, they must be filed in the proceedings at the outset of the trial or filed with “a motion”. See: C.C.P. art 1474. There is no requirement that the moving party file a motion to compel in relation to the request for admissions and this may be because the other discovery methods — depositions, interrogatories, etc.— are asking for information that the mover does not have. In a request for admissions the mover is making statements of fact which the mover will not have to prove at trial. See: C.C.P. arts. 1466, 1467, 1468, 1472 and 1474. This conclusion is supported by C.C.P. art. 1472 which allows the mover to recover expenses, including attorney fees, if a request for admissions is not responded to by the party it is directed to, and, if the moving party’s requested admissions are later proven true. C.C.P. art. 1472. ■ However, the admissions must be directed to the proper party, which was not done in this case. While we recognize that State Farm’s name was properly used in the body of the admission requests, the directing paragraph is to an entity with no relation to State Farm. We find this error insufficient to force compliance with the codal requirements for requests for admissions. Notably, the effect of admissions is to relieve the mover of proving facts at trial, thus, there should be no doubt as to the responding party. Thus, we find that the trial judge did not err in refusing to grant the motion to compel and in refusing to deem the matters admitted.

UsSTATE FARM’S ANSWER TO THE APPEAL

State Farm filed an answer to the appeal asserting that the status of plaintiff as an indigent should be revoked because she testified at trial that she was gainfully employed. State Farm also requests that this court assess costs against plaintiff, under La. C.C.P. arts. 5181 et seq.
The privilege to litigate without payment of costs in advance is restricted to those who are clearly entitled to it due to the moving party’s inability to pay the costs of court prior to litigating the action. La.C.C.P. art. 5181, 5182. An indigent is permitted to litigate without payment of costs through the appellate process, unless and until the opposing party, or the trial judge on his own motion, provokes a contradictory hearing to traverse the pauper status. La.C.C.P. art. 5183, 5184. This rule to show cause must be brought in the trial court, where, if the court finds that the litigant is not entitled to pauper status, the court shall rescind its order. See: La.C.C.P. art. 5184.
In this case, State Farm filed a motion to traverse the pauper status in the trial court after plaintiff was granted her appeal. The trial judge denied the motion on the basis that he no longer retained jurisdiction since the appeal was pending.
Under La.C.C.P. art. 2088, the trial judge is divested of jurisdiction only over those matters reviewable under the appeal. A rule to traverse is not a matter reviewable under the appeal and the trial judge retained jurisdiction to conduct the rule to traverse. However, because of our decision herein, the issue is moot.
*1073 In regard to the assessment of costs, we note that the judgement is silent in that respect. Under C.C.P. art. 5188, if the pauper is unsuccessful in the suit instituted, costs shall be assessed against that person. However, in this case we have reversed the judgment of the trial court. Thus, this article is inapplicable. Since costs were not assessed in the trial court we will do so for both for trial and appeal against the unsuccessful parties herein, State Farm and LIGA.
| is Accordingly, the judgment of the trial court is hereby reversed. Judgment is hereby rendered in favor of plaintiff and against defendants, Calvin Perkins, State Farm Mutual Automobile Insurance Company and Louisiana Insurance Guaranty Association, on behalf of Fidelity Fire and Casualty Company, in the amount of $3,828.01 for special damages and $2,500.00 for general damages. Judgment is further rendered in favor of defendant, Lionel Perkins, and against plaintiff, Patricia Schexnayder, dismissing her suit with prejudice and at her costs.
All other costs of the trial court and appeal are assessed against defendants.

REVERSED AND RENDERED.

. This term refers to the area in the brain that the tumor is located.